■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FRANK JAMES, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Queens County, rendered May 5, 1977, convicting him of criminal possession of a weapon in the third degree, upon a jury verdict, and imposing sentence. Judgment affirmed. No opinion. This case is remitted to the Supreme Court, Queens County, for further proceedings pursuant to CPL 460.50 (subd 5). Mollen, P. J., Damiani and Hawkins, JJ., concur; O'Connor, J., dissents and votes to reverse the judgment and dismiss the indictment, with the following memorandum, in which Suozzi, J., concurs: Following a jury trial, the appellant was convicted of criminal possession of a weapon in the third degree arising out of the following facts and circumstances. Shortly after midnight on the morning of August 11, 1976, while appellant was driving an automobile in Jamaica, Queens, at a fast rate of speed with neither tail nor headlights showing, he was followed by Detective Bowen and Police Officer Cavallaro in an unmarked car. After observing appellant commit several traffic violations, the police activated a revolving red light and "signalled him over". The appellant promptly complied and, by the light of his flashlight, Detective Bowen observed a revolver, later found to contain four live rounds of ammunition, lying in open view on the front floor mat on the driver's side of the car. The appellant was arrested and charged with criminal possession of a dangerous weapon. It was stipulated that he had no permit to possess the gun. Detective Bowen testified, in substance, that appellant informed him that "when he saw the headlight you know he realized or felt we were police and something bumped against him on the floor. He looked on a [sic] seat. There was a gun there, and he threw it on the floor and tried to kick it under the seat." The statement was not reduced to writing. That portion of Bowen's testimony, despite its obvious confusion and contradiction, was, in substance, corroborated by Officer Cavallaro. The prosecution proposes that such conduct was clearly indicative of appellant's guilt. However, even a cursory analysis of the facts disputes this premise. It is appellant's contention that he was fleeing from a danger, real or fancied, and that he knew by this time that there was a gun on the seat of the car. He denied having made the statement attributed to him, but even assuming that it had been made, is it not susceptible of entirely different interpretations? In the dark of the night, being suddenly confronted with the flashing red light on the police car behind him, would it not be a rather automatic reaction to throw the gun to the floor? The point

is that such conduct, in the context of the situation appellant found himself in, is not at all necessarily evidence of guilt, but must be weighed in the totality of the circumstances. Although in further testimony both officers denied that appellant told them how he came into possession of the gun, they corroborated, at least to a degree, appellant's story that he had earlier been involved in a fight, or some type of argument, in a tavern somewhere on Rockaway Boulevard and that he (appellant) thought that the police officers in the unmarked car were the people from the tavern following him as he hurried away from there. It was the appellant's testimony that on the night in question he was starting his vacation and that he was on his way home from Brooklyn, where he had been visiting a fellow employee. He stopped at a bar on Rockaway Boulevard, as was his occasional custom, to have a nightcap. He said that one of three men, all strangers, approached him at the bar and accused him of "messing with my old lady." Fearful of becoming involved in an altercation, since he could see one of the men ostensibly cleaning his fingernails with a knife, appellant testified that he left his drink on the bar and quickly exited the premises. He observed two of the men follow him and saw one of them mount a motorcycle parked immediately behind appellant's vehicle; the other man, holding a gun, stuck his hand inside the open window on the passenger side of appellant's car. Appellant struck the inserted hand at the wrist and felt something land on the seat next to him. He quickly observed that the object was the gun in question. Believing that he was being followed, at least by the man on the motorcycle, the appellant sped from the scene, wildly traversing a circuitous route and committing various traffic violations until, it was his testimony, he observed the flashing red light on the car behind him and then realized that he was being followed by a police vehicle. It was the appellant's testimony that, on command, he promptly stopped and immediately informed the police officers of his encounter with the unknown strangers and that he repeatedly denied the gun was his as he sought to explain its presence in the vehicle. Although there is a distinct disparity between appellant's version of the facts and the police officers' recollection thereof, nothing contained in the record suggests a deliberate fabrication on either side. The police admittedly made no record of appellant's statements and concededly testified from memory. Hence, let us examine and explore the possibilities suggested by these diverse recitals. When placed under arrest, a search of the appellant disclosed that he had on his person a checkbook and a sum of approximately $150 in cash. The ensuing cross-examination of appellant on this issue indicated clearly the theory of the prosecution, i.e., that appellant was carrying the gun for protection because of the comparatively large sum of money in his possession. Let us follow that theory to its ultimate and logical conclusion. Does it not defy all logic and good sense that appellant would pursue the utterly absurd and totally inexplicable course of conduct that is clearly and concededly established by the record? In substance, it was the police testimony that appellant was driving "at a pretty fast rate of speed" through largely deserted city streets, that for a mile or so he was following a circuitous route with neither head nor tail lights showing, that he drove through at least one red traffic light and several stop signs without stopping and that he committed numerous other traffic violations. What more certain manner of attracting prompt police attention could possibly be devised? Parenthetically, it is clear from the record that no suggestion is made of any mental illness or aberration on appellant's part; it is conceded that he was neatly dressed, not intoxicated, in full control of himself and his faculties, his speech was not slurred and he

had a steady walk. The final determination of the charges contained in the indictment is largely dependent upon the question of credibility and the resolution of that issue by a jury should not lightly nor ordinarily be disturbed. However, to an experienced and reasoning mind, the simply-told story of appellant carries with it the ring of truth—an element in the case not to be treated in perfunctory fashion. The power of this court to review facts (see CPL 470.15) and to reach new conclusions is rendered meaningless if, in the light of such uncommon, cogent and compelling facts as are here present, we complacently affirm as infallible the verdict of the jury. In my opinion, the unwonted facts herein set forth impel a finding that appellant's guilt was not established beyond a reasonable doubt. I note, in passing, the appellant's background as it is portrayed in the probation report. He is 49 years of age and lives with his wife and five children in a home they own in Queens. For more than a decade he has been steadily employed by the New York City Transit Authority and his salary in 1976 was in excess of $15,000. On the debit side, the report indicates that more than 30 years ago, when he was 19 years of age, appellant pleaded guilty to an indictment charging robbery in the first degree. Surely, the seriousness of this 1946 conviction is dimmed by the passage of time—30 years of successful self-rehabilitation—and it is noteworthy that the conviction was properly declared inadmissible by the Criminal Term upon the granting of a *Sandoval* motion. Pursuing it a step further, the probation report discloses the extraordinary circumstances surrounding that single flaw in appellant's otherwise totally admirable record. It states: "At 19, after the death of his mother, the defendant and one of his brothers robbed a store for money to pay the funeral bill." The judgment of conviction should be reversed and the indictment dismissed.